MARIANELA VELEZ,  )
 )
          Plaintiff, )
 )
v.  )     **ORDER**
 )
CHRISTINE E. WORMUTH,  )
Secretary of the Army,  )
 )
          Defendant. )

On June 4, 2020, Marianela Velez ("Velez" or "plaintiff") filed a pro se amended complaint against the Secretary of the Army ("defendant" or "Army") alleging race, age, and sex discrimination, a hostile work environment based on race, age, and sex, and retaliation in violation of Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act of 1967 arising from her civilian employment for the United States Army [D.E. 13]. On February 16, 2021, the court adopted Magistrate Judge Numbers's report and recommendation concerning defendant's motion to dismiss and dismissed all of Velez's claims except her Title VII failure-to-promote sex discrimination claim [D.E. 30]. On January 18, 2022, defendant moved for summary judgment [D.E. 46] and filed a memorandum, a statement of material facts, and exhibits in support [D.E. 47–51]. On February 8, 2022, Velez, now proceeding through counsel, responded in opposition [D.E. 52–55]. On March 8, 2022, defendant replied [D.E. 57]. As explained below, the Army did not discriminate against Velez because of her sex when it did not promote her. Thus, the court grants defendant's motion for summary judgment.

I.

Velez is a security assistant in the emergency services division of the 596th Transportation Brigade at the Military Ocean Terminal Sunny Point ("Sunny Point"). See Stmt. Mat. Facts ("SMF") [D.E. 48] ¶ 1; Resp. Stmt. Mat. Facts ("Resp. SMF") [D.E. 54] ¶ 1. In May 2016, Velez applied for a secretary position, which would have been a promotion for her. See SMF ¶¶ 6–7; Resp. SMF ¶¶ 6–7; Velez Dep. [D.E. 55-4] 4. The person vacating the role was a woman who retired or took another job. See [D.E. 51-6] 2; Velez Dep. at 4; Pekatos Dep. [D.E. 55-7] 7.

The secretary position to which Velez applied is a Grade 6 position. See SMF ¶ 6; Resp. SMF ¶ 6. Under the relevant hiring policies for Grade 6, a selecting official develops a merit-based ranking system to determine the best-qualified candidates and determines whether interviews are necessary to fill the position. See SMF ¶ 4; Resp. SMF ¶ 4. According to the job announcement, the role consists of five primary responsibilities. They are: (1) "[r]eceive calls and visitors and determine[] the nature of the inquiry to refer to appropriate staff member," (2) "[c]oordinate arrangements for conferences, meetings and travel plans," (3) "[s]erve as the Government International Merchant Purchase Authorization Card (IMPAC) credit card holder," (4) "[p]rovide guidance and assistance to office personnel on applicable procedures, directives, etc., related to administrative functions," and (5) "[m]aintain time and attendance reporting systems." [D.E. 49-5] 2. The job announcement stated that a competitive candidate would have at least one year of relevant work experience for tasks such as providing clerical support for a Directorate of Operations' office, receiving calls and visitors, providing routine information, answering status requests, and maintaining a supervisor's calendar and suspense records on all correspondence and action documents. See id. The announcement also stated the position requires a secret security clearance. See id. at 3.

2

Spero Pekatos ("Pekatos"), then director of cargo operations at Sunny Point, was the direct supervisor over the vacant secretary position to which Velez applied and was the selecting official in charge of filling the vacancy. See SMF ¶¶ 8–9; Resp. SMF ¶¶ 8–9; Pekatos Dep. at 4, 7. On June 8, 2016, the Civilian Personnel Advisory Center sent Pekatos a list of ten candidates who were "best qualified" to fill the vacant position. See SMF ¶ 9; Resp. SMF ¶ 9; [D.E. 50-2]. Of the ten candidates, four (including Velez) were already employees at Sunny Point. Pursuant to a union contract, those four employees received priority consideration. See SMF ¶¶ 5, 10; Resp. SMF ¶¶ 5, 10. The four internal candidates were Damon Barr ("Barr"), Azurminique Dethrow ("Dethrow"), TJ Messier ("Messier"), and Velez. See SMF ¶ 10; Resp. SMF ¶ 10. Pekatos reviewed all the internal candidates' resumes. See SMF ¶ 11; Resp. SMF ¶ 11. Pekatos also obtained references for Barr and Dethrow and spoke with their supervisors; however, he did not do the same for Velez and Messier because Pekatos had heard positive feedback about them in conversations with Velez's and Messier's supervisors. See SMF ¶¶ 12–13; Resp. SMF ¶¶ 12–13.

Pekatos determined that all four candidates were well qualified, and he decided to interview all of them. See SMF ¶ 14; Resp. SMF ¶ 14; Pekatos Decl. [D.E. 55-5] ¶ 17. In preparation for the interviews, Pekatos formulated three questions to ask the candidates. See SMF ¶ 15; Resp. SMF ¶ 15. The questions were: (1) "[t]ell me about your work experience," (2) "[t]ell me why you should be selected for this position," and (3) "[w]hat shift do you currently work and can you work five days a week." [D.E. 51-5]. Pekatos sought a candidate with strong communications skills, and he was assessing candidates for their ability to speak well in a formal setting, given that the secretary position is often a person's first point of contact with the office. See SMF ¶ 16; Resp. SMF ¶ 16. Pekatos testified that he "was looking for someone who would portray a very strong and confident display in their mannerism, someone who could talk clearly and talk well." Pekatos Dep. at 12.

3

On June 8, 2016, Pekatos went to Velez's desk and asked her if she was available for an interview. See SMF ¶ 18; Resp. SMF ¶ 18. Velez agreed to an interview. See SMF ¶ 19; Resp. SMF ¶ 19; Velez Dep. at 5–6. Velez did not say she was unavailable, and she did not ask for more time to prepare. See SMF ¶ 19; Resp. SMF ¶ 19; Velez Dep. at 5–6. In her EEOC complaint, Velez stated that during the interview, Pekatos "asked [Velez] about [her] education, if [she] knew DTS, if [she] had a government purchase credit card and time cards," and if she spoke Spanish. [D.E. 50-4] 1. Velez stated she responded in the affirmative to these questions. See id. In her deposition, Velez testified that Pekatos rushed through the interview, did not take notes during the interview, did not ask Velez about her work experience or why he should select her for the position, and seemed like he already had someone else in mind for the job. See Resp. SMF ¶ 40; Velez Dep. at 7. However, a document listing Pekatos's three questions for Velez's interview has notes under each question. As for the work experience question, Pekatos wrote "see resume." [D.E. 51-5] 1. As for the question concerning why Pekatos should select Velez, Pekatos wrote "moderate responsive" and "informal." Id.; see Pekatos Decl. ¶ 33 ("For example, [Velez was] informal in how she presented the information from her resume. It was like speaking to a friend rather than a formal interview setting."). As for working hours, Pekatos wrote that Velez responded that she currently worked four days per week but could work five days per week. See [D.E. 51-5] 1.

In her EEOC complaint, Velez alleged that Pekatos told her during the interview that she "would be communicating or working with other male members of the directorate" and asked Velez whether she would cry if one of them spoke rudely to her. [D.E. 50-4] 1. In her interrogatory responses, Velez restated what Pekatos allegedly asked her, saying he asked whether she "would cry if any of the workers were to upset me," without specifying whether the workers were male or female. [D.E. 51-6] 2. In her declaration, Velez states Pekatos asked her if she "would cry if the

4

men [she] would be working with upset [her]." Velez Decl. [D.E. 55-1] ¶ 13. In her deposition, Velez testified that Pekatos asked the question both ways, once referring to male coworkers specifically and once generically. See Velez Dep. at 6–7. Pekatos denies he asked Velez a question like this and instead states that he told Velez and Barr during their interviews that "we have a lot of senior civilians that cry and whine a lot." Pekatos Decl. ¶¶ 25, 28; see SMF ¶¶ 24–25; Resp. SMF ¶¶ 24–25. Pekatos says he remembers saying this because Barr responded he was "used to persons complaining about their packages being late because he worked in the mail room." Pekatos Decl. ¶ 28.

Immediately after the interview, Velez saw a coworker, Teresa Sams ("Sams"). See SMF ¶ 27; Resp. SMF ¶ 27. In her EEOC complaint, Velez states that she told Sams what happened to her in the interview and listed Sams as a witness. See [D.E. 50-4] 1–2. But Sams states she does not remember Velez telling her anything specific about the interview and that she and Velez had only "a quick conversation in passing." [D.E. 50-5] ¶ 11; see SMF ¶ 28; Resp. SMF ¶ 28. Sams does not remember Velez saying that Pekatos asked Velez whether she would cry if male employees made her upset. See [D.E. 50-5] ¶ 12; SMF ¶ 29; Resp. SMF ¶ 29. Sams also does not remember Velez being upset or crying after the interview but stated she "would have noticed or remembered that." [D.E. 50-5] ¶ 13; see SMF ¶ 29; Resp. SMF ¶ 29. In her deposition, Velez testified she did not remember Sams's name, she considered Sams a coworker and not a friend, she did not remember when after the interview she talked to Sams, and she did not remember what she told Sams about her interview with Pekatos. See SMF ¶ 30; Resp. SMF ¶ 30; Velez Dep. at 8.

Pekatos chose Barr, a man, for the job. He ranked Dethrow (a woman) second, Velez third, and Messier (a man) fourth. See Pekatos Decl. ¶ 33; Pekatos Dep. at 10. Pekatos told the Civilian Personnel Advisory Center in an email that he selected Barr because Barr "had a proven track record

5

in handling classified information and items," he "had the strongest recommendations," he "displayed the highest level of professionalism during the interviews," and his "current position displayed an ability to work independently when required." [D.E. 50-6] 1; see SMF ¶ 34; Resp. SMF ¶ 34. Similar to the notes from Velez's interview, Pekatos made notes concerning Barr's interview. Under the work experience question, Pekatos wrote "working on his own" and a somewhat indecipherable note about "classified data." [D.E. 51-4] 1. Under the question about why Pekatos should select Barr, Pekatos wrote "professional" and "confident." Id.; see Pekatos Decl. ¶ 33 (stating Barr "came across as very confident, professional, and concise"). The notes also reflect that Barr was already working five days per week. See id.

II.

Summary judgment is appropriate when, after reviewing the record as a whole, the court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Scott v. Harris, 550 U.S. 372, 378, 380 (2007); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment must initially demonstrate the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, see Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. See Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party.

6

See Harris, 550 U.S. at 378.

A genuine issue of material fact exists if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. See Anderson, 477 U.S. at 249. "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position [is] insufficient . . . ." Id. at 252; see Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party, however, cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). Only factual disputes that affect the outcome under substantive law properly preclude summary judgment. See Anderson, 477 U.S. at 248.

III.

Title VII prohibits an employer from taking adverse employment action against an employee because of that individual's sex. See 42 U.S.C. § 2000e-2(a)(1). A plaintiff may establish a Title VII violation through direct evidence of sex discrimination or by proceeding according to the McDonnell Douglas framework. See, e.g., Sempowich v. Tactile Sys. Tech., Inc., 19 F.4th 643, 649 (4th Cir. 2021); Henry v. Vaughn Indus., LLC, 450 F. Supp. 3d 671, 678 (E.D.N.C. 2020). Velez attempts to take both routes.

A.

Velez claims she has direct evidence of sex discrimination. See [D.E. 53] 5. A plaintiff can demonstrate a Title VII violation by showing through direct evidence that sex discrimination motivated an employer's adverse employment action. See, e.g., Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 318 (4th Cir. 2005). "Direct evidence encompasses conduct or statements that both (1) reflect directly the alleged discriminatory attitude, and (2) bear directly on the contested employment decision." Laing v. Fed. Express Corp., 703 F.3d 713, 717 (4th Cir. 2013) (quotations omitted). "Direct evidence is evidence which, if believed, would prove the existence of

7

a fact without any inference or presumptions." Walton v. Harker, 33 F.4th 165, 176–77 (4th Cir. 2022) (quotation omitted). Velez contends that Pekatos asking her whether she would cry if male employees upset her is direct evidence of sex discrimination. See [D.E. 53] 5.

Velez has provided inconsistent statements about whether Pekatos referred specifically to male employees, to employees generally, or both. Compare [D.E. 50-4] 1, with [D.E. 51-6] 2, with Velez Decl. ¶ 13, with Velez Dep. at 6–7. Velez acknowledges her inconsistent statements but argues that the inconsistencies do not matter because Velez "has been clear that Pekatos asked her if she would cry when she was upset." [D.E. 53] 5 n.2. Thus, according to Velez, Pekatos asking her about her emotional response to other employees, regardless of whether the other employees were male or female, is the relevant evidence. See id.

Viewing the record in the light most favorable to Velez and assuming that Pekatos asked Velez whether she would cry if upset, the evidence is not direct evidence of sex discrimination. See Walton, 33 F.4th at 176–77; Laing, 703 F.3d at 717. Notably, there is no additional evidence that Pekatos thought women cry more than men or thought a woman who sometimes cries if upset is incapable of displaying confidence or having strong communication skills. Cf. Lindsey v. Ricoh USA, Inc., No. 2:17-cv-464, 2018 WL 1937062, at *1–2 (E.D. Va. Apr. 24, 2018) (unpublished); Ezekiel v. Tift Cnty. Sch. Dist., No. 7:08-CV-127 HL, 2010 WL 3456135, at *5–6 (M.D. Ga. Aug. 27, 2010) (unpublished). Moreover, a woman held the secretary position before it became vacant, and Dethrow, a woman, was Pekatos's second choice to fill the position. See [D.E. 51-6] 2; Pekatos Decl. ¶ 33; Pekatos Dep. at 7, 10; SMF ¶ 32; Resp. SMF ¶ 32.[1] And other than this single question,

---

[1] Dethrow stated in an EEO declaration that Pekatos did not act inappropriately toward her during the interview and that she has no reason to believe Pekatos chose Barr over her because of her sex. See [D.E. 51-1] ¶¶ 9–12.

8

Velez cites no other statements or conduct by Pekatos indicating he did not hire her because of her sex. See Velez Dep. at 7, 9, 13; cf. Merritt v. Old Dominion Freight Line, Inc., 601 F.3d 289, 300 (4th Cir. 2010) ("It is the decision maker's intent that remains crucial, and in the absence of a clear nexus with the employment decision in question, the materiality of stray or isolated remarks is substantially reduced."). Accordingly, even viewing the record in the light most favorable to Velez, Velez lacks direct evidence of sex discrimination.

B.

If a plaintiff lacks direct evidence of illegal discrimination, a plaintiff can proceed under the burden-shifting framework in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–04 (1973). See Sempowich, 19 F.4th at 649–50; Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004) (en banc), abrogated in part on other grounds by Gross v. FBL Fin. Servs., Inc., 557 U.S. 167 (2009). "The McDonnell Douglas framework is comprised of three steps: (1) the plaintiff must first establish a prima facie case of employment discrimination or retaliation; (2) the burden of production then shifts to the employer to articulate a non-discriminatory or non-retaliatory reason for the adverse action; (3) the burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the stated reason for the adverse employment action is a pretext and that the true reason is discriminatory or retaliatory." Guessous v. Fairview Prop. Invs., LLC, 828 F.3d 208, 216 (4th Cir. 2016). The McDonnell Douglas framework applies to hiring, promotion, termination, and retaliation claims under Title VII. See, e.g., Williams v. Giant Food Inc., 370 F.3d 423, 428, 430 & n.5 (4th Cir. 2004); Beall v. Abbott Laby's, 130 F.3d 614, 619 (4th Cir. 1997), abrogated in part on other grounds by Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002).

If the plaintiff establishes a prima facie case, the burden shifts to the defendant to produce evidence that the adverse employment action was "for a legitimate, nondiscriminatory reason." Tex.

9

Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981). This burden is one of production, not persuasion. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509–11 (1993). If the defendant offers admissible evidence sufficient to meet its burden of production, "the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's stated reasons were not its true reasons, but were a pretext for discrimination." Hill, 354 F.3d at 285 (quotation omitted); see, e.g., Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000); Sempowich, 19 F.4th at 650; King v. Rumsfeld, 328 F.3d 145, 150–54 (4th Cir. 2003). A plaintiff can do so by showing that the employer's "explanation is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of [sex] discrimination." Mereish v. Walker, 359 F.3d 330, 336 (4th Cir. 2004) (quotation omitted), abrogated in part on other grounds by Gross v. FBL Fin. Servs., Inc., 557 U.S. 167 (2009); see Reeves, 530 U.S. at 147.

In analyzing the record concerning pretext, "it is not [the court's] province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the [adverse action]." Hawkins v. PepsiCo, Inc., 203 F.3d 274, 279 (4th Cir. 2000) (quotation omitted). Moreover, a plaintiff cannot show a genuine issue of material fact concerning pretext "by focusing on minor discrepancies that do not cast doubt on the explanation's validity, or by raising points that are wholly irrelevant to it. The former would not create a 'genuine' dispute, the latter would fail to be 'material.'" Holland v. Washington Homes, Inc., 487 F.3d 208, 216 (4th Cir. 2007).

Ultimately, the court focuses on whether the plaintiff has raised a genuine issue of material fact concerning pretext under Reeves and its Fourth Circuit progeny. Under Reeves and its Fourth Circuit progeny, a plaintiff may not "simply show the articulated reason is false"; rather, a plaintiff "must also show that the employer discriminated against [her] on the basis of [sex]." Laber v. Harvey, 438 F.3d 404, 430–31 (4th Cir. 2006) (en banc). In certain cases, however, the factfinder

10

may infer illegal discrimination from the articulated reason's falsity. See id. at 431; Rowe v. Marley Co., 233 F.3d 825, 830 (4th Cir. 2000).

Initially, Velez must establish a prima facie case of sex discrimination. To establish a prima facie case of sex discrimination for failure to promote or to hire, Velez must show that: "(1) she is a member of a protected group, (2) there was a specific position for which she applied, (3) she was qualified for that position, and (4) [the defendant] rejected her application under circumstances that give rise to an inference of discrimination." Williams, 370 F.3d at 430; see McDonnell Douglas, 411 U.S. at 802; Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 268 (4th Cir. 2005). The parties agree that Velez is a member of a protected group, that she applied for an open secretary position, and that she was qualified for that position.

The parties dispute whether Velez has established that Pekatos rejected her application under circumstances giving rise to an inference of sex discrimination. Velez argues that because Pekatos picked Barr, a man, over Velez, she has created an inference of sex discrimination.

The Fourth Circuit has stated that a plaintiff can satisfy the fourth prong of the McDonnell Douglas framework by merely "show[ing] that the position was filled by" someone outside the plaintiff's protected group. Carter v. Ball, 33 F.3d 450, 458 (4th Cir. 1994); see Burdine, 450 U.S. at 253 n.6; cf. George v. Youngstown State Univ., 966 F.3d 446, 470 (6th Cir. 2020). More recently, the Fourth Circuit has cast doubt on that principle, stating that such a rule would mean "any qualified member of a protected class who alleges nothing more than that she was denied a position or promotion in favor of someone outside her protected class would be able to survive a Rule 12(b)(6) motion." McCleary-Evans v. Md. Dep't of Transp., 780 F.3d 582, 588 (4th Cir. 2015). In any event, viewing the record and Pekatos's decision to hire Barr over Velez in the light most favorable to Velez, the court assumes without deciding that Velez has established a prima facie case of sex

11

discrimination. See Gary v. Facebook, Inc., 822 F. App'x 175, 180 (4th Cir. 2020) (unpublished) ("Under McDonnell Douglas, an inference of discrimination arises from evidence that the employer favored a [male] comparator over the plaintiff.").

The burden shifts to defendant to produce evidence showing Pekatos chose not to hire Velez for a legitimate, nondiscriminatory reason. According to defendant, Pekatos chose Barr because he "had a proven track record in handling classified information and items," he "had the strongest recommendations," he "displayed the highest level of professionalism during the interviews," and his "current position displayed an ability to work independently when required." [D.E. 50-6] 1; see SMF ¶ 34; Resp. SMF ¶ 34. According to Pekatos, the decisive factor was that Barr had the best interview of the four internal candidates. See Pekatos Decl. ¶¶ 32–33. Pekatos's notes from Barr's interview comport with the reasons Pekatos gave to the Civilian Personnel Advisory Center for choosing Barr. See [D.E. 51-4] 1. Velez does not contest that defendant has met its burden of production to show a legitimate, nondiscriminatory reason for not hiring Velez. See [D.E. 53] 7.

Instead, Velez argues that Pekatos's stated reasons for hiring Barr over her are pretextual. In support, Velez contends that Pekatos asked her derogatory questions and displayed a derogatory demeanor toward her during the interview, that Velez was more qualified than Barr, and that Pekatos "had a personal desire to hire a man" to fill the position. [D.E. 53] 8.

As for Velez's argument that Pekatos asked her derogatory questions and displayed a derogatory demeanor toward her during the interview, Velez's evidence "create[s] only a weak issue of fact as to whether the employer's reason was untrue." Reeves, 530 U.S. at 148. As discussed, Velez has been inconsistent about what Pekatos asked her during the interview, and Sams does not remember Velez appearing upset after the interview or telling Sams that Pekatos acted in a derogatory way toward her during the interview. In contrast, there is "abundant and uncontroverted

12

independent evidence" that Pekatos chose Barr for legitimate, nondiscriminatory reasons, and Pekatos has been consistent about the reasons that animated his hiring decision. Id.

As for Velez's argument that she was more qualified than Barr, Velez's qualifications for the job do not suggest that Pekatos's stated reasons for hiring Barr are unworthy of credence. Velez can establish pretext by showing her qualifications were "demonstrably superior" to Barr's qualifications. Heiko v. Colombo Savings Bank, F.S.B., 434 F.3d 249, 261–62 (4th Cir. 2006); see Gary, 822 F. App'x at 181–83. Velez's job experience overlaps significantly with the job requirements for the secretary position to which she applied. Compare [D.E. 55-2], with [D.E. 49-5]. But the same is true for Barr. Although Barr had less formal education than Velez, his experience included "ensur[ing] clerical and administrative portions of the mail room are accomplished effectively," "coordinat[ing] the distribution of high-value items to vendors and customers as a result of received calls and inquiries," utilizing a government credit card, creating and submitting purchase requests, handling callers, preparing summaries, briefing supervisors on meetings, "[p]rocess[ing] leave requests and daily status reports for the time and attendance report," "[c]omposing routine correspondence," "[d]eal[ing] with a wide variety of personnel with different backgrounds in a courteous manner on a daily basis," "creating TDY travel orders and vouchers through the online defense management travel system," and other administrative functions. See [D.E. 55-6] 1–3. Barr also had a secret security clearance, which Velez did not have. See id. at 6; [D.E. 49-2].

Both Barr and Velez had experience from which Pekatos could conclude that both were similarly qualified to fill the vacant secretary position. And Pekatos did, in fact, reach that conclusion. See Pekatos Decl. ¶ 17 ("Of the ten candidates, the four I indicated earlier were internal so I reviewed their resumes. They all looked good and had similar qualifications so I elected to interview all four."). After reaching that conclusion, Pekatos made his final hiring decision based

13

on the interviews. See id. ¶¶ 17, 33 (stating "the deciding factor was the interview"). Interview performance is a legitimate basis for a hiring decision, and Velez has not cited evidence creating a genuine issue of material fact concerning whether her interview was stronger than Barr's interview or whether Pekatos's reliance on the candidates' interview performance to make his hiring decision was pretextual. See Byrd-Hedgepeth v. Cap. One Servs., LLC, No. 3:19cv05, 2020 WL 5831822, at *16–17 (E.D. Va. Sept. 30, 2020) (unpublished); Harris v. Rumsfeld, 428 F. Supp. 2d 460, 467–68, 467 n.5 (E.D. Va. 2006).

As for her argument that Pekatos wanted to hire a man, Velez cites Pekatos's testimony that he wanted someone "very strong and confident" and that Barr was the "strongest" interviewee. See [D.E. 53] 11–12; Pekatos Dep. at 12. Velez argues that because Pekatos wanted to hire someone "strong and confident" and he chose a man, Pekatos must think "that Velez, a woman, was weak." [D.E. 53] 11–12. Velez's argument rests on the false assumption that Pekatos believed that men are stronger or more confident than women or that women are incapable of being strong and confident. Velez cites no evidence to support her false assumption that Pekatos held those beliefs. See [D.E. 53] 11–12. Moreover, other evidence undermines Velez's argument. After all, Pekatos thought Messier, a man, had a worse interview than Dethrow and Velez, both women, because Messier was "not strong" and displayed "minimal confidence." Pekatos Decl. ¶ 33.

Even viewing the record in the light most favorable to Velez, no rational jury could find that Pekatos's reasons were pretextual or that Pekatos did not hire Velez because of her sex. Although the court must "examine employment decisions for unlawful discrimination," the court is not "cloaked with authority to strip employers of their basic business responsibilities." Hux v. City of Newport News, 451 F.3d 311, 315 (4th Cir. 2006). Without such authority, the court does not sit to judge the "wisdom or folly" of Pekatos's hiring decisions. Jiminez v. Mary Washington Coll.,

14

57 F.3d 369, 383 (4th Cir. 1995). Even viewing the evidence in the light most favorable to Velez, no rational jury could find that the Army did not promote her because of her sex. Thus, the court grants defendant's motion for summary judgment.

III.

In sum, the court GRANTS defendant's motion for summary judgment [D.E. 46]. Defendant may file a motion for costs in accordance with the Federal Rules of Civil Procedure and this court's local rules. The clerk shall close the case.

SO ORDERED. This 29 day of July, 2022.

JAMES C. DEVER III
United States District Judge